# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-1948

_____

|  |  |  |
|---|---|---|
| Omni Behavioral Health, a Nebraska corporation, | * * * | |
|  | * | |
| Appellant, | * | |
|  | * | Appeal from the United States |
| v. | * | District Court for the District of |
|  | * | Nebraska. |
| Steve Miller, individually and in his official capacity as Detective for the Bellevue City Police Department, | * * * * | |
|  | * | |
| Appellee. | * | |

_____

Submitted: November 12, 2001

Filed: April 2, 2002

_____

Before BYE, RICHARD S. ARNOLD, and BEAM, Circuit Judges.

_____

BEAM, Circuit Judge.

Omni Behavioral Health ("Omni") appeals the district court's[1] order granting Detective Steven Miller's ("Miller") motion for summary judgment based on qualified

_____

[1]The Honorable Thomas M. Shanahan, United States District Judge for the District of Nebraska.

immunity, and dismissing Omni's Fair Housing Act and section 1983 claims. For the reasons discussed below, we affirm.

## I.    BACKGROUND

Omni is a non-profit corporation that provides foster care services to wards of the State of Nebraska. As part of this business, Omni operated the Woodlawn Group Home located in Bellevue, Nebraska. Woodlawn provided housing and foster care to children pursuant to a contract with the Nebraska Department of Health and Human Services ("NDHHS"). The contract's cancellation section provided that,

> [e]ither party hereto may cancel this contract for any reason upon thirty (30) days written notice to the other party. If it is determined that the Contractor's practices are harmful to the child/family, abusive, and/or contrary to Department policy, the contract can be canceled immediately upon written notice.

Detective Miller is a police officer with the Bellevue Police Department and for the past several years has specialized in investigating child abuse cases. He has extensive experience in this area. He developed the Child Abuse Unit at the Bellevue Police Department and has completed approximately three hundred hours of training regarding child abuse in the last nine years. From November 1997 to November 1998, Miller investigated eight allegations of abuse of residents at the Woodlawn Group Home. In each instance, Miller investigated the allegations of abuse after receiving reports from teachers, nurses, or Woodlawn residents.

During the course of his investigation, Miller arrested four African-American Woodlawn staff members for various charges arising from physical altercations with two different residents. Charges against three of the staff members were ultimately dismissed and the fourth staff member was acquitted. The Woodlawn staff members allege that they were harassed by Miller because of their race. Miller insists that he

followed established protocol and acted in the best interests of the children. Shortly after the arrests, the NDHHS provided Omni with thirty days advance written notice that it was cancelling its contract with Woodlawn. Upon the cancellation of the contract, Woodlawn ceased operations and shut down.

Omni argues that Miller's investigation and arrests were discriminatory, unfounded, and resulted in the cancellation of its contract with the NDHHS. Omni alleges that Miller's conduct violated Omni's rights under the Fair Housing Act, 42 U.S.C. § 3601 et seq.. Pursuant to 42 U.S.C. § 1983, Omni also alleges that Miller's conduct deprived Omni of its right to equal protection and due process by engaging in a discriminatory campaign to shut down the Woodlawn facility.

## II.  DISCUSSION

We review a district court's grant of summary judgment de novo. Wilson v. Spain, 209 F.3d 713, 716 (8th Cir. 2000). De novo review is also applicable where summary judgment is granted on the basis of qualified immunity. Lambert v. City of Dumas, 187 F.3d 931, 935 (8th Cir. 1999). Summary judgment is properly granted when, "the record, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact and that the party moving for summary judgment is entitled to judgment as a matter of law." Greeno v. Little Blue Valley Sewer Dist., 995 F.2d 861, 863 (8th Cir. 1993).

### A.  Section 1983 Due Process Claim

Omni alleges that Miller misused his position as a detective to carry out a campaign of harassment designed to close down the Woodlawn facility. Miller's conduct, Omni argues, violated the Due Process Clause of the Fourteenth Amendment and it now seeks to recover civil damages from Miller. Section 1983 affords redress against a person who, under color of state law, deprives another person of any federal

constitutional or statutory right. City of Oklahoma City v. Tuttle, 471 U.S. 808, 816 (1985). But, public officials are entitled to qualified immunity and shielded from liability when their conduct does not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

"[T]o withstand a motion for summary judgment on qualified immunity grounds, a civil rights plaintiff must (1) assert a violation of a constitutional right; (2) demonstrate that the alleged right is clearly established; and (3) raise a genuine issue of fact as to whether the official would have known that his alleged conduct would have violated plaintiff's clearly established right." Habiger v. City of Fargo, 80 F.3d 289, 295 (8th Cir. 1996). Omni's claim fails all three prongs of this test.

In order to survive summary judgment on this claim, Omni must first establish that its due process rights were violated. To do this, Omni must identify a protected liberty or property interest of which it was deprived by Miller. In addition, the Supreme Court has held that, "the Due Process clause is [substantively] violated by executive action only when [the executive action] 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'" County of Sacramento v. Lewis, 523 U.S. 833, 847 (1998) (quoting Collins v. City of Harker Heights, 503 U.S. 115, 128 (1992)). Omni asserts that it was deprived of a liberty interest because Miller interfered with Omni's right to operate a legitimate business without unreasonable governmental interference. Omni cites Meyer v. Nebraska, 262 U.S. 390, 399 (1923) for the proposition that it has the right "to engage in any of the common occupations of life." Omni claims that because Miller's investigation led the NDHHS to cancel its contract with Omni its occupational liberty interest was infringed upon. Miller responds to this contention by claiming that this court's en banc decision in Singleton v. Cecil, 176 F.3d 419, 425 (8th Cir. 1999) forecloses Omni's argument based on Meyer because Singleton held that there was no protected liberty interest in an individual employee's at-will government job. Miller claims that

-4-

Omni's contract with the NDHHS was terminable at will and, therefore, <u>Singleton</u> requires the conclusion that Omni does not have a protected liberty interest.

Even if <u>Meyer</u> and <u>Singleton</u> can respectively and effectively be recruited for duty in this conflict, which we doubt, the cases do not determine the outcome of this litigation because we need not decide whether a protected liberty interest exists in an at-will government *contract*. Omni needs to demonstrate that Miller's conduct was "'arbitrary, or conscience shocking, in a constitutional sense.'" <u>Lewis</u>, 523 U.S. at 847 (quoting <u>Collins</u>, 503 U.S. at 128), and it has failed to do so.

The Supreme Court has cautioned that the Due Process Clause "does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm." <u>Lewis</u>, 523 U.S. at 848. <u>Lewis</u> described the spectrum of conduct that can give rise to different types of liability and reasoned that constitutional liability requires egregious conduct on the part of a government official:

> We have . . . rejected the lowest common denominator of customary tort liability as any mark of sufficiently shocking conduct, and have held that the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process. It is, on the contrary, behavior at the other end of the culpability spectrum that would most probably support a substantive due process claim; conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.

<u>Id.</u> at 848-49 (internal citations omitted).

Miller's conduct–investigating reports of child abuse at a foster care facility–does not approach the unconstitutional end of the culpability spectrum. Miller investigated the Woodlawn facility after reports of potential abuse were made

to him by school officials or Woodlawn residents. It is clearly reasonable that a detective specializing in child abuse investigations would investigate claims that children were being abused at a group home facility. In addition, Diane Martig, a Protection and Safety Worker with NDHHS for over twelve years, accompanied Miller on virtually all of his investigations and attested that she thought Miller's conduct was in line with standard investigative protocol. The only evidence Omni presents regarding Miller's reasonableness is conclusory statements made by Woodlawn employees who were convinced Miller was out to undermine the facility. These allegations are not sufficient to raise a fact issue in the face of voluminous evidence that Miller's investigations were conducted in a professional manner. If there was viable support beyond bare allegations that Miller conducted his investigation in order to harass Woodlawn employees because of their race, it is possible, if not likely, that such conduct would meet the "shock the conscience" test. Absent such evidence in this case, we refuse to turn the Fourteenth Amendment into "a font of tort law to be superimposed upon whatever systems may already be administered by the States." Paul v. Davis, 424 U.S. 693, 701 (1976).

Omni also asserts it had a protected property interest as a result of its contract with the NDHHS. It is well-settled that a contract with a state entity can give rise to a property right protected under the Due Process Clause. See, e.g., Perry v. Sindermann, 408 U.S. 593, 599-601 (1972) (holding that a professor's contract that could be terminated only for cause constituted a property right protected by the Fourteenth Amendment). However, the Supreme Court has never held that every state contract gives rise to a property interest protected by the Due Process Clause. See id. (reasoning that a non-tenured teacher's contract does not create a protectable property interest). State contracts found to be protected property interests generally fall into two categories:

> [T]he first type arises where the contract confers a protected status, such as those "characterized by a quality of either extreme dependence in the

case of welfare benefits, or permanence in the case of tenure, or sometimes both, as frequently occurs in the case of social security benefits." The second, albeit related type of property interest arises where the contract itself includes a provision that the state entity can terminate the contract only for cause.

Unger v. National Residents Matching Program, 928 F.2d 1392, 1399 (2d Cir. 1991) (quoting S & D Maint. Co. v. Goldin, 844 F.2d 962, 966 (2d Cir. 1988)). The contract between Omni and NDHHS fits neither category. The contract was terminable at will–and therefore did not have the permanence of tenure, and the parties did not have a dependency relationship similar to that created by welfare benefits. If every disgruntled contractor were allowed to allege a constitutional violation when it lost a government contract, the federal courts would be overrun with state law contract claims. Linan-Faye Constr. Co. v. Housing Auth. of Camden, 49 F.3d 915, 932 (3d Cir. 1995).

Omni argues that in addition to the contract, it had a license from the state to operate the facility. Omni alleges that the existence of a license creates a protected property interest because the regulatory scheme limits the state's discretionary authority to deny, revoke, or suspend a license. See Nebraska Regulations 474 NAC 6-003.19 et seq. The problem with this argument is that the state did not revoke Omni's license and the regulatory scheme that governs foster home licensing explicitly provides that "[t]he issuance of a foster care license does not guarantee the placement of children." Id. at 6-003.24. Therefore, the existence of a license did not create a protected property interest. The state was free to decide to enter into a contract with Omni or not–the license did not elevate the contract to a protected property interest.

Even if Omni had a protected liberty or property right that was violated by Miller, Omni still needed to clear the second hurdle of the qualified immunity test and prove that such a right was clearly established. Habiger, 80 F.3d at 295. For a

constitutional right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 640 (1987). In light of pre-existing case law, it is far from apparent that Miller's conduct was unlawful. While there appears to be no reported case dealing with the precise situation before us, to find a right clearly established, "it is not necessary that the Supreme Court has directly addressed the issue, nor does the precise action or omission in question need to have been held unlawful." Norfleet v. Arkansas Dep't of Human Servs., 989 F.2d 289, 291 (8th Cir. 1993) (internal citation omitted). However, there must be the "requisite degree of factual correspondence" between the case at issue and previous cases. Lappe v. Loeffelholz, 815 F.2d 1173, 1177 (8th Cir. 1987) (internal citations and quotations omitted).

The only cases that appear to be factually similar to this case involve lawsuits by parents claiming that their liberty interest in the care and custody of their children was violated by child abuse investigations. See, e.g., Thomason v. SCAN Volunteer Serv., Inc., 85 F.3d 1365 (8th Cir. 1996); Myers v. Morris, 810 F.2d 1437 (8th Cir. 1987); Manzano v. South Dakota Dep't of Soc. Servs., 60 F.3d 505 (8th Cir. 1995); Callahan v. Lancaster-Lebanon Intermediate Unit 13, 880 F. Supp. 319 (E.D. Pa. 1994). In each of these cases, the court held the state actor that was investigating child abuse was entitled to qualified immunity. Manzano is particularly instructive:

> As we stated in Myers, "the liberty interest in familial relations is limited by the compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves." 810 F.2d at 1462. Moreover, as the First Circuit has correctly noted, "[t]he right to family integrity clearly does not include a constitutional right to be free

from child abuse investigations." Watterson v. Page, 987 F.2d 1, 8 (1st Cir. 1993). The need to continually subject the assertion of this abstract substantive due process right to a balancing test which weighs the interest of the parent against the interests of the child and the state makes the qualified immunity defense difficult to overcome. Moreover, the requirement that the right be clearly established at the time of the alleged violation is particularly formidable.

Manzano, 60 F.3d at 510. Applying the above analysis here, it is clear that the right to occupational liberty, to the extent that it exists at all in this context, does not include a right to be free from child abuse investigations.

The only child abuse investigation case that Omni cites for the proposition that Miller violated clearly established rights is Whisman v. Rinehart, 119 F.3d 1303 (8th Cir. 1997). The case misses the mark. Whisman rejected qualified immunity for a child abuse investigation because it concluded that "[n]o investigation was done to determine whether it was necessary or even advisable" to take the child at issue into protective custody. Id. at 1310. The case turned on the total failure by the state investigator to do any meaningful investigation at all. Here, on the other hand, there was an extensive investigation, including hours of interviews, prompted by school officials and residents at Woodlawn. In addition, Whisman is inapposite because there was no evidence that the child in that case had been physically harmed, whereas here there was evidence of physical injury, even if there were conflicting stories about how those injuries occurred. Id. An investigator faced with a child that has apparent physical injury is in a much different position than one who "knew there was no indication of any physical neglect." Id.

In sum, we can find no authority that allows us to conclude that a reasonable officer would have known he was violating Omni's constitutional rights by conducting an extensive child abuse investigation at the Woodlawn facility. There is no case that directly reaches the issue, and the vast majority of cases that are at all

analogous tend to conclude that a clearly established violation of a constitutional right does not occur when a fundamental right is balanced against a child abuse investigation. Callahan, 880 F. Supp. at 330-31 (citing seventeen cases which held officials were entitled to qualified immunity for investigation of child abuse).

Even if a constitutional violation has been established, Omni also fails the final obstacle to overcoming a motion for summary judgment on qualified immunity grounds. Omni must raise a genuine issue of fact as to whether Miller should have known that his conduct violated plaintiff's clearly established rights. Habiger, 80 F.3d at 295. Stated differently, the "linchpin of qualified immunity is the objective reasonableness of the officer's actions." Wilson v. Spain, 209 F.3d 713, 716 (8th Cir. 2000). Omni argues that Miller's conduct was not objectively reasonable because the Woodlawn facility was randomly visited by the NDHHS several times between April 1998 and August 1998 and no evidence of improper treatment was uncovered. In addition, Omni argues that Miller's investigation uncovered evidence that some of the resident's reports of abuse may have been fabricated. However, taking these facts as true, we conclude that Miller's conduct was still objectively reasonable. "[Q]ualified immunity shields a defendant from suit if he or she could have reasonably believed his or her conduct to be lawful 'in light of clearly established law and the information [that the defendant] possessed.'" Smithson v. Aldrich, 235 F.3d 1058, 1061 (8th Cir. 2000) (quoting Anderson, 483 U.S. at 641). In light of all of the information Miller possessed, his investigation was objectively reasonable. Miller received several reports of abuse not only from Woodlawn residents, but from school officials as well. When Miller responded to these reports of abuse, they were corroborated by the existence of apparent physical injury. Protocol required an investigation upon reports of abuse. The NDHHS official that accompanied Miller on most of his investigations attested to the professionalism and thoroughness of Miller's investigation. Given Miller's extensive experience with child abuse investigations and the evidence he was faced with about the possibility of abuse at the Woodlawn facility, it is apparent that his investigation and the arrests he made were objectively reasonable. If Miller had

not pursued an investigation, he would have been in violation of established standards. Instead, Miller did investigate and now he faces a lawsuit. "It is precisely this type of damned if you do, damned if you don't, discretionary decision-making on the part of government officials that the doctrine of qualified immunity was meant to protect." Callahan, 880 F. Supp. at 339.

Omni also asserts that Miller's conduct was not objectively reasonable because his investigation was motivated by race. However, as explained later, Omni failed to present any evidence that Miller was motivated by racial animus, beyond the unsupported and conclusory allegations by Woodlawn staff, which do not create a genuine issue of material fact.

### B.    Section 1983 Equal Protection Claim

Omni alleges that Miller's investigation was discriminatory and violated its rights under the Equal Protection Clause. In support of this allegation, Omni points to the statements of four African-American employees at Woodlawn who claim Miller's investigation was pursued because of the race of those running the facility. In addition, Omni points to the arrest of four of its African-American employees as evidence of intentional discrimination.

We agree with the district court that there is not sufficient evidence in the record favorable to Omni which would support a verdict in Omni's favor on the equal protection claim. As earlier indicated, the claim made by the Woodlawn employees that Miller's investigation was pursued because of their race is an unsupported and conclusory allegation. The fact that four African-American employees were arrested does not raise an inference of discrimination considering that the only employees arrested were the ones accused of abusing the residents. The evidence in the record does not create a factual dispute concerning Miller's racial motivation for the investigation. Rather, the record indicates an investigation undertaken by an

-11-

experienced child abuse investigator in response to concerns about the treatment of children at the facility. Thus, we find Omni's evidence of intentional discrimination insufficient as a matter of law.[2]

### C.    Fair Housing Act Claim

Omni claims that Woodlawn predominantly housed minorities and handicapped children and Miller's investigation and arrests had the effect of depriving housing to these minority and handicapped residents when the facility was closed, in violation of the Fair Housing Act, 42 U.S.C. § 3601 et seq. The Department of Housing and Urban Development ("HUD") has adopted the test outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973) for evaluating discrimination claims brought under the Fair Housing Act. United States v. Badgett, 976 F.2d 1176, 1178 (8th Cir. 1992). Under the McDonnell Douglas test, after a plaintiff makes a prima facie case of discrimination by a preponderance of evidence, a presumption of illegality arises and the defendant has the burden of articulating a legitimate, non-discriminatory justification for the challenged conduct. If the defendant satisfies this burden, the plaintiff has the opportunity to prove by a preponderance of the evidence that the legitimate reasons asserted by the defendant are actually mere pretext. Id.

Even assuming Omni could establish a prima facie case of discriminatory effect, it is clear that Miller has come forward with a legitimate, non-discriminatory justification for his conduct–namely, his concern that children were being abused at Woodlawn. Omni has failed to create a material fact issue on pretext because its only evidence of discrimination is the generalized assertions of Woodlawn employees, unaccompanied by any real evidence. In addition, even if Omni did succeed in its claim that Miller violated the Fair Housing Act, his investigation was objectively

---

[2]As previously discussed, Miller is also entitled to qualified immunity on Omni's equal protection claim because his actions were objectively reasonable.

reasonable, and he is shielded from liability based on qualified immunity as previously explained.

## III.   CONCLUSION

For the reasons stated, the judgment of the district court is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.