[No. B185375. Second Dist., Div. Seven. May 2, 2007.]

OTIS BENN et al., Plaintiffs and Appellants, v.
COUNTY OF LOS ANGELES, Defendant and Respondent.

**COUNSEL**

Mazur & Mazur, Janice R. Mazur and William E. Mazur, Jr., for Plaintiffs and Appellants.

Monroy, Averbuck & Gysler, Clayton C. Averbuck and Jennifer E. Gysler for Defendant and Respondent.

**OPINION**

**JOHNSON, Acting P. J.**—A nonprofit corporation which provided foster family agency and group home foster care services for dependent minors of the juvenile court brought a civil rights action for damages under 42 United States Code section 1983 against the County of Los Angeles (County). The corporation's complaint alleged, among other claims, the County violated its procedural and substantive due process rights by placing all of its facilities on "Do Not Refer" status without adequate notice, hearing, or an opportunity to cure the alleged deficiencies. The trial court found as a matter of law the federal Adoption Assistance and Child Welfare Act of 1980 (42 U.S.C. § 1305 et seq.) did not create rights enforceable in a 42 United States Code section 1983 action. The court further found the corporation's contracts were terminable at the convenience of the County and thus created no constitutionally protected property interest. Finally, the court found the County's act of placing all the corporation's facilities on "Do Not Refer" status was neither arbitrary nor capricious. As an alternative and independent ground the court

found the County was protected from liability by the doctrine of qualified immunity. Accordingly, the trial court found the County was entitled to judgment as a matter of law and granted its motion for summary judgment. We affirm.

## FACTS AND PROCEEDINGS BELOW

Appellant, Angelica Group Homes Thomas and William Foundation (Angelica), received a license to operate foster family group homes and beginning in 1988 entered into contracts with the County to provide group home foster care. Angelica later received a license to operate a foster family agency as well. Appellants, Otis Benn and his wife Lillian Benn, are the founders and principals of Angelica. By 1997 Angelica operated five group homes, four for minors and one exclusively for the care of minor mothers and their babies. According to the Benns, at its peak Angelica's group home and foster family agencies employed more than 100 people and enjoyed revenues exceeding $5 million annually.

In April 1997 the County Grand Jury Juvenile Services Committee issued its final report on group homes. The report raised several concerns about the quality of care foster children received in group homes. The County Board of Supervisors took several actions in response. Among other things, the County Board of Supervisors mandated increased program audits and financial audits to ensure the quality of care provided in group homes.

In the fall of 1997 the County conducted a program audit of Angelica's group homes. The County representative had an "exit" conference with the Benns at the conclusion of the audit to discuss her findings. The County in its written report found Angelica was "seriously out of compliance with state regulations and the contract/program statement." The County audit found, among other deficiencies, Angelica had not been providing required individual and group counseling; had not secured court authorizations for psychotropic medications for some residents; foster children's medical and dental needs had not been timely addressed; required reports to the Department of Children and Family Services (DCFS) and case workers were not timely; and foster children had been provided inadequate clothing, food and activities. The Benns offered to prepare and submit a corrective action plan to address the deficiencies discovered during the audit. They were required to submit their corrective action plan within 15 days of the October 24, 1997 audit report. The record contains no evidence the Benns ever submitted a corrective action plan.

Earlier, on October 9, 1997, the County placed the mother-and-child group home in Perris, California on "Do Not Use" status. An investigation by the

dependency court legal services group found problems with the group home which ranged from inadequate medical care to inadequate food and clothing.

The County apparently placed Angelica's four other group homes on "Do Not Refer" status shortly thereafter.

The County conducted repeat audits of Angelica's foster family agency. The County found Angelica in material breach of contract because it "continue[d] to find deficiencies" with medical and dental care and psychotropic medication authorizations. In January 1998 the County placed Angelica's foster family agency on "Do Not Refer" status as well.

Also in 1998 the County conducted a fiscal audit of Angelica covering the year January 1, 1997, to December 31, 1997. The County Auditor/Controller reported his findings to the County Board of Supervisors in May 1999. In general terms, the audit "disclosed serious deficiencies in Angelica's controls over the disbursement of group home funds, including numerous questionable expenditures, a lack of accounting records and limited or no supporting documentation. As a result [the Auditor/Controller] questioned $964,831 in expenditures made by Angelica with County funds received under its Group Home and FFA Contracts." The report recommended the DCFS resolve the questioned costs and collect any disallowed amounts.

The DCFS demanded payment from the Benns but apparently did not otherwise institute proceedings of any kind to enforce its request. According to the Benns, the County refused to take Angelica off "Do Not Refer" status until Angelica repaid the County the requested amounts.

The parties' group home contract provides the County may impose a "Do Not Refer" order in the event the County, in its "sole discretion," determines deficiencies pose a health or safety risk to any child. The contract provision discussing the "suspension of intake," and "Do Not Refer" status, states: "Notwithstanding any other provision of this Agreement, the COUNTY retains the right to suspend referrals of children to CONTRACTOR at any time at its sole discretion, in a manner consistent with the procedures outlined in Exhibit B. To the extent possible and reasonable and without interfering with any law enforcement investigation, the COUNTY will discuss the reason(s) for suspension of referral with the CONTRACTOR verbally and in a written letter at the time of the decision. The CONTRACTOR may discuss the recommendation or action with representatives from the COUNTY as set forth in Exhibit B."[1]

---

[1] Paragraph 39 of the 1998 group home contract between Angelica and the County.

We decline Angelica's request to take judicial notice of a document purporting to be the exhibit B mentioned in the parties' group home contract. The document was not part of the

Alternatively, if the program audit reveals deficiencies which do not pose an immediate health or safety risk, then the contractor must cure the breach within the time set by the County and submit a corrective action plan. If the contractor fails to submit or implement a corrective action plan, or fails to satisfactorily cure the violations or breach, then the County may place the contractor on "Do Not Refer" status until the violation or breach is cured. If the violation or breach is not cured within 30 days the County may terminate the contract.[2] However, the contractor may request an appeal in which case no remedy will be enforced until the appeal is resolved.[3]

On the other hand, the contract also provides the County may terminate the contract "for convenience" when deemed in its best interests to do so.[4]

Angelica and the Benns filed a civil rights suit against the County and others in March 2000 seeking damages under 42 United States Code section 1983. They claimed they received no written notice the "Do Not Refer" status was being extended to all the Angelica group homes. As a result, the Benns claimed, they were denied the opportunity to present a corrective action plan in order to remove the "Do Not Refer" directive. The Benns claimed the County's failure to provide the requisite notice and opportunity to be heard contravened its contractual obligations specifying how a contractor may cure defaults discovered during a program audit. Angelica and the Benns' complaint alleged the County's action deprived Angelica of a constitutionally protected property interest, violated Angelica's procedural and substantive due process rights and this same lack of procedural safeguards violated federal statutory law as well. Because the effect of the County's action was to

---

record before the trial court. The document is not certified as authentic, and in any event, refers to a "Foster Care Agreement" and not to the group home contract. Moreover, because Angelica brought no claim for breach of contract the document is irrelevant to any issue raised in this appeal.

[2] The parties' contract provides the County may terminate a group home contract if the County "at its sole discretion" finds any one of a number of circumstances indicating a default, misrepresentation, noncompliance with a corrective action plan, or the like.

[3] Paragraph 27.1 of the 1998 group home contract between Angelica and the County.

[4] Paragraph 28.1 of the parties' group home contract states: "This Agreement may be terminated, when such action is deemed by COUNTY to be in its best interest. Termination of this Agreement shall be effected by delivery to CONTRACTOR of a written notice of termination specifying the extent to which performance of work is terminated and the date upon which such termination becomes effective. The date upon which such termination becomes effective shall be no less than sixty (60) days after the notice is sent unless by mutual consent."

The parties' foster family agency agreement similarly permits the County to terminate the contract "for convenience," provided the termination is not "arbitrary and capricious, unreasonable or discriminatory." (Par. 25.1 of the parties' foster family agency foster care agreement eff. through Dec. 31, 1998.)

prohibit future placements of dependent children in any of Angelica's facilities, the Benns claimed the "Do Not Refer" directive effectively put Angelica out of business, for which they sought monetary redress.

In the meantime, the California Department of Social Services, which controls the licensing of foster family agencies and group homes, had been conducting its own investigation of Angelica. In February 2001 the state filed formal accusations against Angelica, seeking to revoke Angelica's licenses. The accusations of misconduct and deficiencies covered the period 1997 through 2000. The accusations ranged from minor allegations such as graffiti scrawled on facility walls to very serious matters such as allegations of molestation of foster children in Angelica's facilities.

In September 2001, and without admitting the truth of the allegations, Angelica and the Benns entered into a stipulation and waiver with the state. Angelica and the Benns agreed to immediately surrender Angelica's licenses and to permanently waive the right to apply or to reapply for any license issued by the department. Angelica and the Benns further waived their right to a hearing on the truth of the accusations and the right to an appeal by entering into the stipulation and waiver.

Angelica and the Benns filed their second amended and operative complaint in April 2002. By this time only the County remained as a defendant. The complaint alleged seven causes of action, only three of which remain at issue in this appeal: (1) alleged violations of the federal Adoption Assistance and Child Welfare Act, specifically violations of 42 United States Code section 671(a)(3), (10) and (12), by failing to afford Angelica a hearing to determine the propriety of depriving Angelica of foster care maintenance payments based on the program and fiscal audits; (2) alleged violations of procedural due process by imposing and maintaining "Do Not Refer" status on Angelica's group homes without providing the contractually required notice, the opportunity to cure the alleged deficiencies, and a hearing to challenge the County's decision; and (3) alleged violations of substantive due process by the County's arbitrary and capricious action in imposing the "Do Not Refer" directive, thereby depriving Angelica of its protected property interest in its contracts with the County. Angelica's complaint sought compensatory damages under 42 United States Code section 1983, interest, attorneys' fees and cost of suit.

The County moved for summary judgment, or, in the alternative, summary adjudication of issues. After extensive briefing, supplemental briefing and oral argument covering several months the trial court ultimately granted the County's motion for summary judgment. The trial court found as a matter of law the Adoption Assistance and Child Welfare Act did not create rights

enforceable in a 42 United States Code section 1983 action. The court further found the corporation's contracts were terminable at the convenience of the County and thus created no constitutionally protected property interest. Finally, the court found the County's act in placing all the corporation's facilities on "Do Not Refer" status was neither arbitrary nor capricious given the alleged problems discovered during the various audits. As a separate and independent ground, the trial court found the County was immune from liability for its actions under the doctrine of qualified immunity. Accordingly, the trial court found the County was entitled to judgment as a matter of law and granted its motion for summary judgment. Angelica and the Benns appeal from the adverse judgment.[5]

## DISCUSSION

### I. *STANDARD OF REVIEW OF A SUMMARY JUDGMENT.*

"Because this case comes before us after the trial court granted a motion for summary judgment, we take the facts from the record that was before the trial court when it ruled on that motion." (*State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026, 1034–[10]35 [6 Cal.Rptr.3d 441, 79 P.3d 556].) " 'We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained.' " (*Id.* at p. 1035.) "We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party. (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142 [12 Cal.Rptr.3d 615, 88 P.3d 517].)"[6]

Summary judgment is appropriate if all the papers submitted show there is no triable issue as to any material fact and the moving party is entitled to a judgment as a matter of law.[7]

We review the judgment with these standards in mind.

---

[5] The trial court found the Benns lacked standing to pursue individual claims because they were not parties to Angelica's contracts with the County. Although the Benns filed a notice of appeal they have apparently conceded the propriety of the court's ruling by failing to challenge it on appeal.

[6] *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037 [32 Cal.Rptr.3d 436, 116 P.3d 1123].

[7] Code of Civil Procedure section 437c, subdivision (c).

## II. *ANGELICA HAS NO PROPERTY INTEREST PROTECTED BY THE DUE PROCESS CLAUSE OF THE FEDERAL CONSTITUTION BASED ON ITS CONTRACTS WITH THE COUNTY.*

Angelica contends its contracts with the County gave it a reasonable expectation of an entitlement to continued foster children placements and thus a protected property interest in continued funding from the County, enforceable in an action under 42 United States Code section 1983 (section 1983).[8]

■ Absent a finding the group homes posed a health or safety risk to foster children, the parties' contract required the County to provide Angelica certain procedural protections before the County could impose "Do Not Refer" status on its group homes. Apparently, Angelica was not provided the contractually required notice, was not provided the opportunity to prepare and implement a corrective action plan as provided for in the contract, and was not given appeal rights prior to the County's decision to impose the "Do Not Refer" directive. To the extent the County failed to adhere to these contractual requirements for being placed on permanent "Do Not Refer" status, Angelica had a breach of contract claim. However, Angelica does not assert a breach of contract claim. Instead, Angelica seeks damages for alleged violations of its constitutional rights.

"Section 1983 imposes liability on anyone who, under color of state law, deprives a person 'of any rights, privileges, or immunities secured by the Constitution and laws.' "[9]

■ A threshold requirement to a substantive or procedural due process claim is the plaintiff's showing of a liberty or property interest protected by the Constitution.[10] A contract with a state entity can give rise to a property right protected under the Fourteenth Amendment.[11] However, although every contract may confer some legal rights under state law, not all contracts give rise to a property right protected under the due process clause.[12] As the Supreme Court has emphasized, "[t]he hallmark of property, . . . is an individual entitlement grounded in state law, which cannot be removed except

---

[8] Angelica does not claim any constitutionally protected liberty interest.

[9] *Blessing v. Freestone* (1997) 520 U.S. 329, 340 [137 L.Ed.2d 569, 117 S.Ct. 1353].

[10] *Board of Regents v. Roth* (1972) 408 U.S. 564, 576 [33 L.Ed.2d 548, 92 S.Ct. 2701].

[11] *Board of Regents v. Roth, supra*, 408 U.S. 564, 577.

[12] *Perry v. Sindermann* (1972) 408 U.S. 593, 599–601 [33 L.Ed.2d 570, 92 S.Ct. 2694] (a professor's contract terminable only for cause was a property right protected by the Fourteenth Amendment); cf. *Physicians' Serv. Med. Group v. San Bernardino Cty.* (9th Cir. 1987) 825 F.2d 1404, 1408 (contract to supply medical services to the County did not create a legitimate claim of entitlement rising to the level of a property interest protected by the due process clause).

'for cause.' [Citations.] Once that characteristic is found, the types of interests protected as 'property' are varied and, as often as not, intangible, relating 'to the whole domain of social and economic fact.' [Citations.]"[13]

■ "[T]wo general types of contract rights are recognized as property protected under the Fourteenth Amendment: (1) where 'the contract confers a protected status, such as those "characterized by a quality of either extreme dependence in the case of welfare benefits, or permanence in the case of tenure, or sometimes both, as frequently occurs in the case of social security benefits" '; or (2) where 'the contract itself includes a provision that the state entity can terminate the contract only for cause.' "[14]

The contract at issue in this case does not fall into any of the categories of contracts recognized as creating a protected property interest. Angelica does not have protected status characterized by extreme dependence on the state as might a qualified welfare or Social Security recipient.[15] Angelica had a contract to supply services to the County. Neither the contract's subject matter nor its terms provide the requisite degree of permanence as a contract for tenure or employment for a term of years might.[16] Most significantly, the contract contains no provision stating it could only be terminated for cause.[17]

Angelica notes these facts but contends the "clearly articulated, mandatory procedures set forth in the contract" for being placed on "Do Not Refer" status created an entitlement to continued placements. Angelica argues these procedural requirements were intended to be such a significant restriction on decisionmaking they gave rise to a legitimate claim of entitlement.

[13] *Logan v. Zimmerman Brush Co.* (1982) 455 U.S. 422, 430–431 [71 L.Ed.2d 265, 102 S.Ct. 1148], citing as examples *Barry v. Barchi* (1979) 443 U.S. 55 [61 L.Ed.2d 365, 99 S.Ct. 2642] (horse trainer's license); *Memphis Light, Gas & Water Div. v. Craft* (1978) 436 U.S. 1 [56 L.Ed.2d 30, 98 S.Ct. 1554] (utility service); *Mathews v. Eldridge* (1976) 424 U.S. 319 [47 L.Ed.2d 18, 96 S.Ct. 893] (disability benefits); *Goss v. Lopez* (1975) 419 U.S. 565 [42 L.Ed.2d 725, 95 S.Ct. 729] (high school education); *Connell v. Higginbotham* (1971) 403 U.S. 207 [29 L.Ed.2d 418, 91 S.Ct. 1772] (government employment); *Bell v. Burson* (1971) 402 U.S. 535 [29 L.Ed.2d 90, 91 S.Ct. 1586] (driver's license); *Goldberg v. Kelly* (1970) 397 U.S. 254 [25 L.Ed.2d 287, 90 S.Ct. 1011] (welfare benefits).

[14] *Linan-Faye Const. Co. v. Housing Auth. of Camden* (3d Cir. 1995) 49 F.3d 915, 932, quoting *Unger v. National Residents Matching Program* (3d Cir. 1991) 928 F.2d 1392, 1399.

[15] See, e.g., *Goldberg v. Kelly, supra*, 397 U.S. 254 (welfare benefits).

[16] See, e.g., *Slochower v. Board of Higher Education* (1956) 350 U.S. 551 [100 L.Ed. 692, 76 S.Ct. 637] (tenured college professor had a property interest protected by procedural due process); *Wieman v. Updegraff* (1952) 344 U.S. 183 [97 L.Ed. 216, 73 S.Ct. 215] (college professors and staff members dismissed during the terms of their contracts had property interests protected by procedural due process).

[17] Compare *Perry v. Sindermann, supra*, 408 U.S. 593, 599–601 (a professor's contract terminable only for cause was a property right protected by the Fourteenth Amendment).

■ "Procedural requirements ordinarily do not transform a unilateral expectation into a constitutionally protected property interest. [Citation.] A constitutionally protected interest has been created only if the procedural requirements are intended to be a 'significant substantive restriction' on . . . decision making. [Citations.] If the procedures required impose no significant limitation on the discretion of the decision maker, the expectation of a specific decision is not enhanced enough to establish a constitutionally protected interest in the procedures. [Citation.]"[18]

Contrary to Angelica's argument, the procedural steps specified in the contract for placing a group home on permanent "Do Not Refer" status did not restrict the decision maker's discretion regarding how or whether it could terminate the contract—or in this case effectively terminate the contract by preventing new referrals to its homes. The group home contract by its terms permitted the County to terminate that contract at any time "for convenience" when the County deemed termination to be in its "best interest."[19]

As to the parties' foster family agency agreement, it does not contain any of the procedural safeguards found in the group home contract for being placed on "Do Not Refer" status. Moreover, the County may terminate the foster family agency contract among other reasons simply "for convenience," provided the termination is not "arbitrary and capricious, unreasonable or discriminatory." According to the DCFS report of January 22, 1998, "repeated audits" of the Angelica foster family agency and "reviews of corrective action plans" continued to find problems with medical and dental care, as well as with psychotropic medication authorizations. Because these matters affected the health and welfare of the children, and remained uncorrected despite multiple audits and corrective plans, the DCFS recommended the Angelica foster family agency be placed on "Do Not Refer" status as well. As a matter of law the County's action is not "arbitrary and capricious, unreasonable or discriminatory" in light of the serious nature of the deficiencies prompting the "Do Not Refer" status.

---

[18] *Goodisman v. Lytle* (9th Cir. 1984) 724 F.2d 818, 820 (guidelines in the faculty code did not enhance the candidate's expectation of obtaining tenure enough to establish a constitutionally protected interest); cf. *Wedges/Ledges of California, Inc. v. City of Phoenix, Ariz.* (9th Cir. 1994) 24 F.3d 56, 63–64 (city ordinances made issuance of licenses of amusement games mandatory upon a finding the games qualified as games of skill, thereby eliminating the city's discretion to revoke or deny licenses for games previously certified as games of skill by the city treasurer).

[19] Paragraph 28.1 of the parties' group home contract states: "This Agreement may be terminated, when such action is deemed by COUNTY to be in its best interest. Termination of this Agreement shall be effected by delivery to CONTRACTOR of a written notice of termination specifying the extent to which performance of work is terminated and the date upon which such termination becomes effective. The date upon which such termination becomes effective shall be no less than sixty (60) days after the notice is sent unless by mutual consent."

■ The mere inclusion of the "termination for convenience" clause in the contracts eliminated the essential characteristic of permanence and entitlement necessary to a finding of a protectable property right. As courts have held, when a state entity can terminate a contract for reasons other than cause the contract does not confer a protected status on the plaintiff.[20]

For example in *Economic Development Corporation of Dade County, Inc. v. Stierheim*[21] a contractor brought a civil rights action against the county and county manager for claims arising from termination of a contract to distribute funds pursuant to a grant program administered by the United States Department of Housing and Urban Development. Under the parties' contract the county could terminate the agreement on one of two conditions: (1) for cause, if the contractor failed to perform or (2) without cause, for convenience on two weeks' notice. Given this contractual provision, the court found the contractor "had no assurances that its contract would still be in force for more than the next two weeks. This lack of an entitlement to the continued existence of its contractual relationship with the county prevented [the contractor] from acquiring a property interest in its contract with the county."[22]

■ The court considered it immaterial the contract had actually been terminated for cause rather than for the county's convenience. "That the county cancelled the contract pursuant to the for-cause provision instead of the convenience provision does not affect this analysis. The question of whether a party has a property interest in a contract entails an examination of the rights that party has under the contract. If there was no property interest when the contract was entered into, no property interest was created by the contract's being terminated pursuant to one of its provisions instead of another. It is the existence of the convenience provision, not its invocation, that defeats [the contractor's] claim that it was deprived of property without due process of law when the contract was terminated."[23]

Similarly, in *Omni Behavioral Health v. Miller*[24] a nonprofit corporation which provided foster care services to wards of the State of Nebraska brought civil rights claims against a police detective whose investigation of allegations of abuse of residents at a foster care facility allegedly resulted in the

---

[20] See *Linan-Faye Const. Co. v. Housing Auth. of Camden, supra,* 49 F.3d 915, 932 ("the state entity could terminate the contract for reasons other than for cause. Indeed, it could be terminated for convenience. To grant Linan-Faye a remedy under § 1983 would create the wholesale federalization of state public contract law . . . .").

[21] *Economic Development Corp. of Dade Co. v. Stierheim* (11th Cir. 1986) 782 F.2d 952.

[22] *Economic Development Corp. of Dade Co. v. Stierheim, supra,* 782 F.2d 952, 954.

[23] *Economic Development Corp. of Dade Co. v. Stierheim, supra,* 782 F.2d 952, 954.

[24] *Omni Behavioral Health v. Miller* (8th Cir. 2002) 285 F.3d 646.

closing of the facility. Omni, as Angelica in the present case, asserted it had a protected property interest as a result of its contract with the state. The *Omni* court recognized that a contract with a state can give rise to a protected property interest when "the state entity can terminate the contract only for cause."[25] However, in *Omni* either party could terminate the contract for any reason with 30 days' written notice, and for this reason the court found the contract did not create a protected property interest.[26] "The contract [between Omni and the state] was terminable at will—and therefore did not have the permanence of tenure, and the parties did not have a dependency relationship similar to that created by welfare benefits. If every disgruntled contractor were allowed to allege a constitutional violation when it lost a government contract, the federal courts would be overrun with state law contract claims. [Citation.]"[27]

So too in the case at bar. Although the parties' contracts were not "at will" contracts as in *Omni*, they contained termination for convenience clauses. The contracts thus gave Angelica no assurance of continued foster children placements, no assurance of continued funding from the County, and thus no permanent rights. "This lack of an entitlement to the continued existence of its contractual relationship with the county prevented [Angelica] from acquiring a property interest in its contract with the county."[28]

It is true, the County did not terminate its contracts with Angelica but rather placed Angelica on "Do Not Refer" status. The "Do Not Refer" directive prevented future placements and future funding which eventually caused Angelica to have no further dealings with the County. The County's act thus arguably amounted to a de facto termination of the contract. Nevertheless, whether the contracts were actually terminated is immaterial to the analysis whether the contracts gave Angelica a constitutionally protected property interest. To recall, the "hallmark" of a constitutionally protected property interest is an entitlement "which cannot be removed except 'for cause.' "[29] Because Angelica's interest in the contracts could have been taken away for something less than cause, and indeed at the County's convenience—at the contracts' inception or at any time thereafter—this lack of permanence defeats Angelica's claim it was deprived of its constitutionally protected property rights without due process of law.

---

[25] *Omni Behavioral Health v. Miller, supra,* 285 F.3d 646, 652.

[26] *Omni Behavioral Health v. Miller, supra,* 285 F.3d 646, 650.

[27] *Omni Behavioral Health v. Miller, supra,* 285 F.3d 646, 652–653.

[28] *Economic Development Corp. of Dade Co. v. Stierheim, supra,* 782 F.2d 952, 954.

[29] *Logan v. Zimmerman Brush Co., supra,* 455 U.S. 422, 430.

■ Accordingly, the trial court did not err in concluding the County was entitled to judgment as a matter of law on Angelica's claim for damages for alleged violations of procedural due process based on its contracts with the County.

III. *THE PROVISIONS IN THE ADOPTION ASSISTANCE AND CHILD WELFARE ACT RELIED ON BY ANGELICA DO NOT CREATE INDIVIDUAL RIGHTS ENFORCEABLE IN AN ACTION UNDER SECTION 1983.*

Angelica contends it also had a protected property right pursuant to statute, specifically 42 United States Code section 671(a)(3), (10) and (12) (section 671), of the Adoption Assistance and Child Welfare Act (Act), enforceable in an action under section 1983.

■ The United States Supreme Court has held section 1983 safeguards certain rights conferred by federal statutes as well.[30] However, "[i]n order to seek redress through § 1983 . . . , a plaintiff must assert the violation of a federal *right*, not merely a violation of federal *law*. [Citation.] [The United States Supreme Court has] traditionally looked at three factors when determining whether a particular statutory provision gives rise to a federal right. First, Congress must have intended that the provision in question benefit the plaintiff. [Citation.] Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence. [Citation.] Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms. [Citations.]"[31]

On the other hand, section 1983 "is not available to enforce a violation of a federal statute 'where Congress has foreclosed such enforcement of the statute in the enactment itself and where the statute did not create enforceable rights, privileges, or immunities within the meaning of § 1983.' "[32]

In *Wilder v. Virginia Hospital Association*[33] the United States Supreme Court found the Boren Amendment to the Medicaid Act created a substantive federal right enforceable by providers under section 1983 to require states to adopt reasonable and adequate reimbursement rates. To qualify for federal

---

[30] *Maine v. Thiboutot* (1980) 448 U.S. 1 [65 L.Ed.2d 555, 100 S.Ct. 2502].

[31] *Blessing v. Freestone, supra,* 520 U.S. 329, 340–341.

[32] *Suter v. Artist M.* (1992) 503 U.S. 347, 355–356 [118 L.Ed.2d 1, 112 S.Ct. 1360], quoting *Wright v. Roanoke Redev. & Housing Auth.* (1987) 479 U.S. 418, 423 [93 L.Ed.2d 781, 107 S.Ct. 766].

[33] *Wilder v. Virginia Hospital Assn.* (1990) 496 U.S. 498 [110 L.Ed.2d 455, 110 S.Ct. 2510].

financial assistance, states were required to submit a plan to the Secretary of Health and Human Services for approval, which among other requirements, established a scheme for reimbursing health care providers. In 1980 Congress passed the Boren Amendment to the Medicaid Act which required states to establish provider reimbursement rates which were " 'reasonable and adequate' " to meet the costs of "efficiently and economically operated facilities."[34] A nonprofit association of public and private hospitals filed suit against the State of Virginia for declaratory and injunctive relief, claiming the state plan violated the Medicaid Act because its reimbursement rates were not "reasonable and adequate." The Supreme Court found there was "little doubt that health care providers are the intended beneficiaries of the Boren Amendment. The provision establishes a system for reimbursement of providers and is phrased in terms benefiting health care providers . . . ."[35] The court also found the obligation imposed on the states was not too "vague and amorphous" to be judicially enforceable because the statute and regulations set out factors the state was required to consider when setting its rates.[36]

In *Blessing v. Freestone*,[37] by contrast, the United States Supreme Court concluded mothers and children who were entitled to child support services under title IV-D of the Social Security Act (42 U.S.C. § 301 et seq.) had no private right of action to require state agencies to comply with its provisions. "[T]he requirement that a State operate its child support program in 'substantial compliance' with Title IV-D was not intended to benefit individual children and custodial parents, and therefore it does not constitute a federal right. Far from creating an *individual* entitlement to services, the standard is simply a yardstick for the Secretary to measure the *systemwide* performance of a state's Title IV-D program. Thus, the Secretary must look to the aggregate services provided by the State, not to whether the needs of any particular person have been satisfied."[38]

In *Suter v. Artist M.*[39] the United States Supreme Court considered the very statute at issue in this case, the Act. The issue in *Artist M.* was whether section 671(a)(15) created private rights, enforceable by child beneficiaries in a section 1983 action, to require states to make "reasonable efforts" to prevent removal of children from their homes. (*Suter v. Artist M., supra*, at p. 358.) The court reviewed the statute in its entirety and agreed the Act imposed "a requirement on the States, but that requirement only goes so far as to ensure that the State have a plan approved by the

---

[34] *Wilder v. Virginia Hospital Assn., supra*, 496 U.S. 498, 503.

[35] *Wilder v. Virginia Hospital Assn., supra*, 496 U.S. 498, 510.

[36] *Wilder v. Virginia Hospital Assn., supra*, 496 U.S. 498, 519.

[37] *Blessing v. Freestone, supra*, 520 U.S. 329.

[38] *Blessing v. Freestone, supra*, 520 U.S. 329, 343.

[39] *Suter v. Artist M., supra*, 503 U.S. 347.

Secretary which contains the 16 listed features."[40] In reviewing the language of the specific subdivision the court concluded section 671(a)(15) confers neither an enforceable private right on its beneficiaries nor creates an implied cause of action on their behalf. "Careful examination of the language relied upon by [the child beneficiaries], in the context of the entire Act, leads us to conclude that the 'reasonable efforts' language does not unambiguously confer an enforceable right upon the Act's beneficiaries. The term 'reasonable efforts' in this context is at least as plausibly read to impose only a rather generalized duty on the State, to be enforced not by private individuals, but by the Secretary . . . ."[41] The court pointed out other sections of the Act provided enforcement mechanisms. Under the Act the Secretary of Health and Human Services has the authority to reduce or eliminate payments to a state on a finding the state's plan no longer complies with the statute or the state has failed to comply with its own plan.[42]

Congress amended the Social Security Act in 1994 in 42 United States Code section 1320a-2 to clarify no provision of the Social Security Act is to be considered unenforceable solely because of its inclusion in a section of the act requiring a state plan or specifying the contents of a state plan. The amendment expressly states it is not intended to limit or expand the grounds for determining the availability of private actions to enforce state plan requirements. Congress further specified the amendment is not intended to alter the holding in *Suter v. Artist M.* that section 671(a)(15) "is not enforceable in a private right of action." (42 U.S.C. § 1320a-2.)

Subsequent to the 1994 amendment, the court in *White by White v. Chambliss*[43] addressed another one of the provisions at issue in this case. In *White*, a mother, individually and as the personal representative of the estate of her daughter who died while in foster care, brought suit against several officials of the South Carolina Department of Social Services under section 1983. The mother argued she had a private right of action under section 671(a)(10) which specifies in order to receive federal funding the state has to establish standards for foster family homes and childcare institutions reasonably in accord with recommended national standards. The *White* court found that for the same reasons articulated in *Suter v. Artist M.*, "section 671(a)(10) does not create an enforceable right."[44] As with section 671(a)(15) at issue in *Suter v. Artist M.*, section 671(a)(10) similarly provided only general guidelines for the state's plan, no specific directives to enforce, and was subject to the alternative enforcement mechanism of the suspension, reduction, or

[40] *Suter v. Artist M., supra*, 503 U.S. 347, 358.
[41] *Suter v. Artist M., supra*, 503 U.S. 347, 363.
[42] *Suter v. Artist M., supra*, 503 U.S. 347, 360.
[43] *White by White v. Chambliss* (4th Cir. 1997) 112 F.3d 731.
[44] *White by White v. Chambliss, supra*, 112 F.3d 731, 739.

withdrawal of funds by the secretary. In these circumstances, the court held "*Suter* . . . forecloses the argument that section 671(a)(10) of the AACWA [the Act] provides the source for an enforceable right through section 1983."[45]

Later in *Gonzaga Univ. v. Doe*[46] the United States Supreme Court considered whether the Family Educational Rights and Privacy Act of 1974 (20 U.S.C. § 1232) provided a personal remedy enforceable under section 1983 to a former undergraduate under provisions of the act prohibiting funding of educational institutions which have a policy or practice of releasing education records to unauthorized persons. The court reviewed prior section 1983 precedent and expressed the view this precedent "made clear that unless Congress 'speak[s] with a clear voice,' and manifests an 'unambiguous' intent to confer individual rights, federal funding provisions provide no basis for private enforcement by § 1983. [Citation.]"[47]

The *Gonzaga* court rejected the notion its cases permitted anything short of an unambiguously conferred right to support a cause of action under section 1983. The court emphasized it was "rights" and not the vaguer and broader "benefits" or "interests" which may be enforced under section 1983.[48] Borrowing from cases regarding implied rights of action the court observed the inquiry overlaps with that under section 1983: "[I]n either case we must first determine whether Congress *intended to create a federal right*."[49] For a statute to create such private rights "its text must be 'phrased in terms of the persons benefited.' [Citation.]"[50] In addition, a plaintiff must show "the statute manifests an intent 'to create not just a private *right* but also a private *remedy*.' [Citation.]"[51]

Under these standards the *Gonzaga* court found the Family Education Rights and Privacy Act did not confer enforceable rights. First, the court noted the statutory language lacked "the sort of 'rights-creating' language critical to showing the requisite congressional intent to create new rights."[52] The provisions instead "spoke to" the Secretary of Education, directing no

[45] *White by White v. Chambliss, supra,* 112 F.3d 731, 739.

[46] *Gonzaga Univ. v. Doe* (2002) 536 U.S. 273 [153 L.Ed.2d 309, 122 S.Ct. 2268].

[47] *Gonzaga Univ. v. Doe, supra,* 536 U.S. 273, 280, quoting *Pennhurst State School v. Halderman* (1981) 451 U.S. 1, 17, 28 [67 L.Ed.2d 694, 101 S.Ct. 1531] and footnote 21 (rejecting a claim the Developmentally Disabled Assistance and Bill of Rights Act conferred privately enforceable rights).

[48] *Gonzaga Univ. v. Doe, supra,* 536 U.S. 273, 283.

[49] *Gonzaga Univ. v. Doe, supra,* 536 U.S. 273, 283.

[50] *Gonzaga Univ. v. Doe, supra,* 536 U.S. 273, 284.

[51] *Gonzaga Univ. v. Doe, supra,* 536 U.S. 273, 284, quoting *Alexander v. Sandoval* (2001) 532 U.S. 275, 286 [149 L.Ed.2d 517, 121 S.Ct. 1511].

[52] *Gonzaga Univ. v. Doe, supra,* 536 U.S. 273, 287.

funds be made available to any institution which had a prohibited policy or practice. The court commented, "[t]his focus is two steps removed from the interests of individual students and parents and clearly does not confer the sort of *individual entitlement*' that is enforceable under § 1983."[53] Reinforcing its view the act did not create individual rights, the court noted the statutory provision did not create a private remedy, but instead authorized the Secretary of Education to deal with violations of the act.[54]

As noted, Angelica claims section 671(a)(3), (10) and (12) of the Act confer an individual entitlement enforceable through a section 1983 action. Section 671 is entitled "State plan for foster care and adoption assistance." These subdivisions of subsection (a) state: "In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which—[¶] . . . [¶] (3) provides that the plan shall be in effect in all political subdivisions of the State, and, if administered by them, be mandatory upon them . . . ."

■ Section 671(a)(10) requires a state plan to establish an authority or authorities "which shall be responsible for establishing and maintaining standards for foster family homes and child care institutions which are reasonably in accord with recommended standards of national organizations concerned with standards for such institutions or homes, including standards related to admission policies, safety, sanitation, and protection of civil rights, and provides that the standards so established shall be applied by the State to any foster family home or child care institution receiving funds under this part . . . ."

■ Finally, section 671(a)(12) requires the state plan to provide "for granting an opportunity for a fair hearing before the State agency to any individual whose claim for benefits available pursuant to this part . . . is denied or is not acted upon with reasonable promptness . . . ."[55]

---

[53] *Gonzaga Univ. v. Doe, supra,* 536 U.S. 273, 287, italics added.

[54] *Gonzaga Univ. v. Doe, supra,* 536 U.S. 273, 289.

[55] Angelica points out some courts have held this subdivision and the regulations implementing it provide foster parents with standing to assert the right to a state administrative hearing to seek reimbursement for expenditures incurred on foster care services. Angelica contends as a provider of foster care services it should similarly have a private right of action under this section. (Citing *Claudio v. Dowling* (1997) 89 N.Y.2d 567 [678 N.E.2d 1211, 656 N.Y.S.2d 599] [foster parents denied higher payments for having cared for special needs children were entitled to a state administrative hearing to seek review of the alleged underpayments of foster care benefits]; *Timmy S. v. Stumbo* (6th Cir. 1990) 916 F.2d 312 [injunction was an appropriate remedy to force the state to provide a hearing to foster parents

■ The context of the Act and language of the provisions indicate Congress intended to benefit foster children and children in need.[56] Nothing in these provisions indicates Congress's intent in adopting these measures was to instead ensure continued funding to benefit foster care agencies or operators of group homes for foster children.[57] If *Suter v. Artist M.* held this statutory language is insufficient to show a Congress speaking with a " 'clear voice' " and manifesting an "unambiguous" intent to confer individual rights on the intended beneficiaries, it is certainly insufficient to confer such individual rights on the corporations and agencies which contract to provide services to the foster children.[58] Although contractors are indirectly benefited by the Act, they are at least "two steps removed" from the language of the statute which is instead directed to the states.[59]

who sought reimbursement of previously incurred foster care maintenance payments]; *Lynch v. Dukakis* (1st Cir. 1983) 719 F.2d 504 [a pre-*Suter v. Artist M.* decision approving a § 1983 cause of action for violations of § 671(a)(16)].)

Of course, Angelica does not seek a state administrative hearing under section 671(a)(12) or otherwise. Nor does Angelica seek reimbursement for *previously incurred* foster care maintenance payments. Instead, Angelica seeks damages for being placed on "Do Not Refer" status which allegedly deprived it of *future* placements and *future* maintenance payments. Curiously, even the authority Angelica relies on has held damages are not available in a section 1983 action alleging a violation of the Act. (*Timmy S. v. Stumbo, supra*, 916 F.2d 312, 316, fn. 6, citing *Scrivner v. Andrews* (6th Cir. 1987) 816 F.2d 261, 264; see also *Guardians Assn. v. Civil Service Comm'n, N. Y. C.* (1983) 463 U.S. 582, 596 [77 L.Ed.2d 866, 103 S.Ct. 3221] ("We have also indicated that 'make whole' remedies are not ordinarily appropriate in private actions seeking relief for violations of statutes passed by Congress pursuant to its 'power under the Spending Clause to place conditions on the grant of federal funds.' *Pennhurst State School and Hospital* v. *Halderman*, 451 U.S. 1, 15 [67 L.Ed.2d 694, 101 S.Ct. 1531] (1981)").)

[56] See *Cort v. Ash* (1975) 422 U.S. 66, 78 [45 L.Ed.2d 26, 95 S.Ct. 2080] (a factor in determining congressional intent for creating a private right of action is whether the plaintiff is " 'one of the class for whose *especial* benefit the statute was enacted . . .' "); *Suter v. Artist M., supra*, 503 U.S. 347, 357 (referring to "the child beneficiaries of the Act").

[57] Many other subsections in section 671(a) refer to foster children sufficient to indicate they are the intended beneficiaries of the Act: subsection (a)(9)(A) (requiring reports of "suspected instances of physical or mental injury, sexual abuse or exploitation, or negligent treatment or maltreatment of a child receiving aid . . . under circumstances which indicate that the child's health or welfare is threatened thereby . . ."); subsection (a)(14) (requires the state to establish specific goals as to the maximum number of children in foster care longer than 24 months); subsection (a)(15)(A) (states "the child's health and safety shall be the paramount concern . . ."); subsection (a)(15)(B) (states "reasonable efforts shall be made to preserve and reunify families"); subsection (a)(16) (directs the state to develop a case plan "for each child receiving foster care maintenance payments"); subsection (a)(22) (requires standards to ensure children in foster care placement are provided quality services "that protect the safety and health of the children"); subsection (a)(24) (requires a certification "prospective foster parents will be prepared adequately with the appropriate knowledge and skills to provide for the needs of the child . . .").

[58] *Gonzaga Univ. v. Doe, supra*, 536 U.S. 273, 280.

[59] *Gonzaga Univ. v. Doe, supra*, 536 U.S. 273, 287.

Congress's stated purpose in adopting the Act was "[f]or the purpose of enabling each State to provide, in appropriate cases, foster care and transitional independent living programs for

Moreover, these provisions lack specific directives and for this reason are too vague to be readily enforceable by the courts. As noted in both *Suter* and *White* the factors listed in section 671 are intended to be general guidelines for the state's plan. In its reply brief Angelica properly concedes the required individualized language is not present in at least section 671(a)(10) and (15).

Finally, Congress did not provide for a private remedy to enforce these provisions of the Act. As noted in *Suter*, other provisions in the Act provide the enforcement mechanisms. If a state's plan no longer complies with the statutory requirements of the Act, or if the state fails to comply with its own plan, then the secretary is authorized to reduce or eliminate payments to the state.[60]

Based on this United States Supreme Court opinion and other precedent, we conclude the trial court was correct in finding section 671(a)(3), (10) and (12) did not confer enforceable private rights on providers of foster care services. Accordingly, we further conclude the trial court did not err in finding the County was entitled to judgment as a matter of law on Angelica's claim under section 1983 for violation of federal statutory law.

## IV. ANGELICA'S ASSERTION OF A VIOLATION OF SUBSTANTIVE DUE PROCESS IS WITHOUT MERIT.

Otis Benn in his declaration in opposition to the County's motion for summary judgment claimed the Angelica foster family agency passed five unidentified audits conducted by the County without requests for a corrective action plan. Angelica thus contends there are triable issues of material fact whether the County knew its act in placing its facilities on "Do Not Refer" status was arbitrary and capricious and thus violated its substantive due process rights.

The United States Supreme Court has "emphasized time and again that '[t]he touchstone of due process is protection of the individual against arbitrary action of government,' [citation], whether the fault lies in a denial of fundamental procedural fairness, [citation], or in the exercise of power

children who otherwise would have been eligible for assistance . . . and adoption assistance for children with special needs . . . ." (42 U.S.C. § 670.)

[60] *Suter v. Artist M., supra*, 503 U.S. 347, 360–361.

without any reasonable justification in the service of a legitimate governmental objective, [citation]."[61]

Under United States Supreme Court precedent "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense' . . . ."[62] Thus, a substantive violation of the due process clause can be established by a showing of official conduct which "shocks the conscience" or violates the " 'decencies of civilized conduct.' "[63] For example, "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."[64]

We will assume Angelica's foster family agency survived five additional audits and the County nevertheless maintained its "Do Not Refer" status. However, this government conduct is insufficiently egregious to shock the conscience or otherwise be considered to violate the decencies of civilized conduct. The County's action may have caused Angelica harm. However, its decision to place Angelica's facilities on "Do Not Refer" status cannot be said to be either arbitrary or capricious based on the various findings in the County's and the state's audits. Those audits revealed Angelica had failed to comply with state regulations, court orders and the program statement; had provided foster children with inadequate food, clothing and medical care; had incurred over $964,000 in questionable expenditures, lacked accounting records, documentation, and the like. Given these allegations the County's official action in placing Angelica's facilities on "Do Not Refer" status was objectively justifiable in order to protect the County's foster children and the quality of the County's foster care program.

Otis Benn's assertion of having survived five additional unidentified audits, is insufficient standing alone to create a triable issue of material fact regarding the County's alleged arbitrary action in the face of the numerous and detailed audits containing these findings of possible dereliction and malfeasance. Accordingly, we conclude the trial court did not err in finding the County was entitled to judgment as a matter of law on Angelica's claim the County's actions violated its substantive due process rights.[65]

---

[61] *County of Sacramento v. Lewis* (1998) 523 U.S. 833, 845–846 [140 L.Ed.2d 1043, 118 S.Ct. 1708].

[62] *County of Sacramento v. Lewis, supra*, 523 U.S. 833, 846.

[63] *County of Sacramento v. Lewis, supra*, 523 U.S. 833, 846, quoting *Rochin v. California* (1952) 342 U.S. 165, 172–173 [96 L.Ed. 183, 72 S.Ct. 205].

[64] *County of Sacramento v. Lewis, supra*, 523 U.S. 833, 849.

[65] In light of our conclusions we need not reach the County's alternative argument it is protected from liability under the doctrines of absolute and/or qualified immunity.

## DISPOSITION

The judgment is affirmed. Respondent is awarded its costs of appeal.

Woods, J., and Zelon, J., concurred.

Appellants' petition for review by the Supreme Court was denied August 8, 2007, S153378.